UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHRISTA BLATZ,                                    Case No. 1:11-cv-895
      Plaintiff,                                Spiegel, J.
                                          Litkovitz, M.J.

    vs.

COMMISSIONER OF                                   **REPORT AND**
SOCIAL SECURITY,                                  **RECOMMENDATION**
      Defendant.

      Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 8), the Commissioner's response in opposition (Doc. 13), plaintiff's reply

memorandum (Doc. 14), and the Commissioner's sur-reply (Doc. 17).

## I. Procedural Background

      Plaintiff filed an application for DIB in January 2008, alleging disability since April 1,

2004, due to three herniated disks in her lumbar spine, two herniated disks in her cervical spine,

clinical depression and high blood pressure. Plaintiff's application was denied initially and upon

reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before

administrative law judge (ALJ) Christopher B. McNeil. Plaintiff appeared at the ALJ hearing

held on March 23, 2010, with counsel. A vocational expert (VE) and a medical expert (ME), Dr.

Walter Hulon, M.D., a physician who specializes in occupational medicine, testified at the

hearing. The hearing was continued to April 5, 2010, at which time plaintiff, her husband Paul

Blatz, and a second VE testified. On May 17, 2010, the ALJ issued a decision denying plaintiff's

DIB application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security Act on December 31, 2009.
>
> 2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2004, through her date last insured of December 31, 2009 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the [plaintiff] had the following severe impairments: degenerative disc disease, scoliosis, a dysthymic disorder, and an anxiety disorder (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift not more than 20 pounds occasionally and not more than 10 pounds frequently. She can push/pull not more than 10 pounds using hand or foot controls. She can sit, stand, and walk about six hours each in an eight-hour workday. She is unable to use ladders, ropes, or scaffolds. She can stoop, kneel, crouch, or crawl not more than occasionally. Due to her mental limitations, any job she could perform must be

3

routine and repetitive. It must not require more than daily planning, and must not have more than occasional contact with coworkers, supervisors, or the general public.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[1]

7. The [plaintiff] was born [in] . . . 1959, and was 44 years old, which is defined as a "younger individual age 18-49", on the alleged onset date. The [plaintiff] subsequently changed age category to "closely approaching advanced age" [in December] 2009, [on] the day before her 50th birthday (20 CFR 404.1563).

8. The plaintiff has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated last insured, considering the [plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintuff] could have performed (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from April l, 2004, the alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(g)).

(Tr. 10-19).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[1] Plaintiff has past relevant work as a machine worker, a purchasing agent, and an inventory control worker. (Tr. 17).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 5,025 unskilled light jobs in the local economy and 728,350 unskilled light jobs in the national economy, citing as examples of such jobs cleaner and clerk, and 850 unskilled sedentary jobs in the local economy and 104,840 unskilled sedentary jobs in the national economy, citing as examples of such jobs bookkeeper/ticket counter and packager. (Tr. 18).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

The pertinent medical findings and opinions have been adequately summarized in the parties' briefs and will not be repeated here. (Doc. 8 at 2-6; Doc. 13 at 2-6). Where applicable, the Court will identify the medical evidence relevant to its decision.

On appeal, plaintiff argues that: (1) the ALJ erred in assessing plaintiff's physical and

mental RFC; (2) the ALJ erred in determining the weight to afford the opinions of plaintiff's

treating physicians; (3) the ALJ erred by failing to give "good reasons" to reject plaintiff's

treating physicians' opinions of disability; (4) the ALJ erred in assessing plaintiff's pain,

credibility, and subjective complaints; and (5) the ALJ erred at step five of the sequential

evaluation by relying on VE testimony that did not take into consideration all of plaintiff's

functional limitations.

### 1. Plaintiff's second and third assignments of errors should be sustained.

The Court will initially address plaintiff's second and third assignments of error as they

are threshold issues in this matter and the two assignments of error are interrelated.  Plaintiff

contends that the ALJ erred in determining the weight to afford the opinions of her treating

physicians - psychiatrist Dr. Geraldine Wu, M.D., orthopedist Dr. Michael Grefer, M.D., and

neurologist Dr. Luis Pagani, M.D. - and by failing to give "good reasons" for rejecting these

physicians' opinions regarding plaintiff's disability.  (Doc. 8 at 10-13).  The Commissioner

argues that the ALJ reasonably weighed the opinions of plaintiff's treating physicians and the

examining and non-examining medical sources.  (Doc. 13 at 8-14).

It is well-established that the findings and opinions of treating physicians are entitled to

substantial weight.  "In general, the opinions of treating physicians are accorded greater weight

than those of physicians who examine claimants only once."  *Walters v. Comm'r of Soc. Sec.*,

127 F.3d 525, 530-31 (6th Cir. 1997).  *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.

1985) ("The medical opinions and diagnoses of treating physicians are generally accorded

substantial deference, and if the opinions are uncontradicted, complete deference.").  Likewise, a

treating physician's opinion is entitled to weight substantially greater than that of a non-

6

examining medical advisor. *Kinsella v. Schweiker,* 708 F.2d 1058, 1060 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); *see also Blakley,* 581 F.3d at 406; *Wilson,* 378 F.3d at 544. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011) (citing former 20 C.F.R. § 404.1527(d)(2)).[3] If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Wilson,* 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict

---

[3] Title 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion that was previously found at § 404.1527(d) is now found at § 404.1527(c).

the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. §404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p).

The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source who has not examined the claimant. *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing former 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). The weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

### a. Physical impairments

The Court will first address the weight the ALJ gave the opinions of the treating physicians concerning the limitations imposed by plaintiff's physical impairments. The ALJ gave "some weight" to the 2004 opinion of plaintiff's treating orthopedist, Dr. Grefer, that plaintiff could perform "sedentary work." (Tr. 16, citing Tr. 461). The ALJ stated that Dr. Grefer gave his opinion in 2004 and later evidence showed plaintiff was capable of performing work at a light exertional level. (Tr. 16). The ALJ gave "lesser weight" to the opinion of

8

plaintiff's treating neurologist and pain management specialist, Dr. Pagani. (*Id.*, citing Tr. 1149). In his opinion dated March 11, 2010, Dr. Pagani stated that he sees plaintiff once every two months for basic check-ups and medication and he had last seen her on January 20, 2010. (Tr. 1149). He reported that he treated plaintiff for lumbar disc degeneration, lumbar disc displacement with radiculopathy, and lumbar radiculitis. He opined that plaintiff "was unable to be gainfully employed" and would continue to remain unable to work indefinitely due to her chronic conditions. He reported that plaintiff had limited range of motion, increased pain with any activity, and considerable weakness throughout the spine and legs. He opined that she needs to take several breaks throughout the day because she is unable to stand, sit, lie down, or walk for more than 15 minutes at a time. He stated that bending, stooping, and reaching in front or above her head also cause increased pain and aggravate her condition. He reported that she has been treated with heavy doses of Methadone and Percocet for pain, and these medications contribute to her inability to work. (*Id.*). The ALJ gave "lesser weight" to Dr. Pagani's opinion because he found even though Dr. Pagani is a treating source, his opinion was not supported by the objective medical evidence in the file; it was "inconsistent with the credible portions of the descriptions of the claimant's activities of daily living"; repeated examinations had shown no sensory or reflex loss or decreased muscle strength; and it was reported plaintiff has a normal gait. (Tr. 16).

In rejecting the treating physicians' opinions and instead finding that plaintiff could perform a restricted range of light work, the ALJ relied on the testimony and assessment of the medical expert, Dr. Hulon; the opinion of the consultative examining physician, Dr. Martin Fritzhand, M.D.; and the opinions of the state agency reviewing physicians, Dr. Jeffrey Vasiloff, M.D., and Dr. Esberdado Villanueva, M.D. (Tr. 16). The ALJ gave "great weight" to Dr.

Hulon's assessment adopting Dr. Vasiloff's June 2008 physical RFC assessment for light work. (*Id.*, citing Tr. 1145-1148). The ALJ credited Dr. Hulon's assessment on the grounds he is an expert in occupational medicine; his assessment was based on the objective medical evidence in the file; and his opinion was consistent the "credible portions of the testimony regarding activities of daily living." (Tr. 16). The ALJ also gave "great weight" to Dr. Fritzhand's physical findings from his consultative examination.[4] (Tr. 16, citing Tr. 748-756). Dr. Fritzhand found that plaintiff walked with a normal gait, and his examination disclosed good range of motion, no joint abnormalities, and no evidence of nerve root damage. (Tr. 755). He diagnosed plaintiff with "Chronic pain syndrome," consisting of "Chronic neck pain" and "Chronic low back pain," with both diagnoses based on the MRI results. (Tr. 755). Dr. Fritzhand opined that plaintiff was capable of "at least a mild amount of sitting, ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects." (Tr. 755). The ALJ stated that Dr. Fritzhand's physical findings were based on the objective medical evidence in the file and were consistent "with the credible portions of the testimony regarding activities of daily living." (Tr. 16). The ALJ gave "great weight" to the assessment of the state agency reviewing physician, Dr. Vasiloff (Tr. 775-782), because the ALJ determined it was based on the objective medical evidence in the file, it was "consistent with the credible portions of the testimony regarding activities of daily living," and Dr. Vasiloff's comments regarding plaintiff's credibility were consistent with the ALJ's "impression of credibility during the hearing." (Tr. 16, citing Tr. 780).

---

[4] The Commissioner argues that by specifying he was giving great weight to Dr. Fritzhand's "physical findings," the ALJ was indicating that he was not giving any weight to the *opinions* offered by Dr. Fritzhand as to plaintiff's degree of limitation. (Doc. 13 at 9, citing Tr. 16). The Court disagrees. It appears the ALJ specifically referred to "physical findings" to clarify that Dr. Fritzhand's assessment was not based on any consideration of plaintiff's psychological impairments. (*See* Tr. 755, wherein Dr. Fritzhand emphasized that his assessment did not "reflect any disability secondary to the patient's underlying mental status.")

10

In his physical RFC assessment dated June 2008, Dr. Vasiloff opined that plaintiff could lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently; she could stand/walk about six hours in an eight-hour workday; she could sit about six hours in an eight-hour workday; she could never climb ladders, ropes, or scaffolds; and she could only occasionally stoop, kneel, crouch, and crawl. (Tr. 776-777). Dr. Vasiloff assessed plaintiff's credibility as follows: "Mostly credible regarding ability to function. Allegations concerning back pain are largely credible. Allegations concerning inability to sit are largely not credible. ROM was excellent and the neuro exam was normal. Allegations concerning inability to stand and walk are partially credible, for the reasons above. Allegations concerning inability to bend and lift are partially credible." (Tr. 780). The ALJ gave "some weight" to the December 2008 opinion of state agency reviewing physician Dr. Villanueva, which affirmed Dr. Vasiloff's RFC assessment as written, on the ground Dr. Villanueva's opinion was based on the "objective medical evidence in file." (Tr. 16, citing Tr. 807).

Upon review of the ALJ's decision, the medical opinions, and the medical evidence of record, the Court finds that substantial evidence does not support the ALJ's decision to discount Dr. Pagani's decision that plaintiff is limited in her ability to sit, stand and walk for prolonged periods of time and must take several breaks during the day. (Tr. 1149). First, the ALJ was not entitled to rely on the testimony of the ME, Dr. Hulon, to discount Dr. Pagani's opinion. Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining

11

source depends on the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3). "A non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that his opinions differ from those of the examining physicians." *Lyons v. Social Security Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001) (citing *Barker v. Shalala*, 40 F.3d 789, 794-95 (6th Cir. 1994)) (ALJ was entitled to accept non-examining medical advisor's opinion as to the severity of the plaintiff's impairments where, to the extent the medical advisor's conclusions differed from those of the examining psychologist, the medical advisor explained his position by reference to the objective medical and psychological reports in the plaintiff's file, as well as the undisputed facts concerning the plaintiff's prior work and social history).

Here, the ALJ was not entitled to rely on Dr. Hulon's assessment to discount the opinion of Dr. Pagani because Dr. Hulon's testimony (1) confirmed the objective findings on which Dr. Pagani relied in finding plaintiff could not stand, sit, or walk for prolonged periods of time and would need to take several breaks throughout the day; and (2) agreed that those objective findings could produce the symptoms and functional limitations plaintiff reported. Dr. Hulon testified at the hearing that plaintiff had been in a vehicular accident, and she suffered from bulging disks and disk degeneration that can produce pain and spasms. (Tr. 39-40). Dr. Hulon also indicated there was a 2004 MRI finding of a "left paracentral and left foraminal disk bulge" causing compression and displacement of the L4 segment nerve and dorsal ganglion, which could possibly be expected to produce pain of the degree and severity plaintiff had complained about. (Tr. 42-43). Dr. Hulon testified that plaintiff's symptoms were consistent with her diagnosis of

12

nerve root compression, and her complaints of numbness down the low back to the bottom of her feet could be consistent with sciatica and symptomatic of degenerative disk disease. (Tr. 47- 48). Dr. Hulon confirmed plaintiff's testimony that "she may have to get up and move around" would be consistent with her condition. (Tr. 80). He testified that whether she would experience frequent interruptions during the work day due to her pain depended on the type of work involved, indicating she would be able to work if she was able to "sit and stand, change positions." (Tr. 79).

Dr. Hulon's testimony is therefore consistent with Dr. Pagani's opinion that plaintiff has limitations on her ability to work due to an inability to sit, stand or walk for prolonged periods of time and her need to take several breaks throughout the work day. (Tr. 1149). Moreover, Dr. Hulon's testimony is inconsistent with his own medical interrogatory answers indicating that plaintiff could perform the standing, sitting and walking requirements of light work without any restrictions. (Tr. 1146, Question #9). Yet, by giving great weight to Dr. Hulon's assessment and rejecting the limitations imposed by Dr. Pagani, the ALJ ignored the apparent inconsistency between Dr. Hulon's interrogatory answers and his testimony provided at the administrative hearing, and the ALJ failed to acknowledge that Dr. Hulon's testimony supported the limitations found by Dr. Pagani.

Furthermore, although the ALJ relied on a lack of objective findings to discount Dr. Pagani's opinion, Dr. Hulon testified as to the difficulty of assessing the severity of plaintiff's pain based on objective evidence. The crux of Dr. Hulon's testimony was that although in his opinion plaintiff's subjective complaints of disabling pain were not corroborated by the objective imaging and other test results, he could not assess the severity of plaintiff's pain due to its

13

subjective nature, and examining physicians could disagree as to the amount of pain plaintiff

experienced and its limiting effects. Dr. Hulon testified at the hearing that plaintiff had bulging

disks that can produce pain and cause spasms (Tr. 39-40), but examining doctors disagreed as to

the degree of pain she experienced and the extent of her disability. (Tr. 41). Dr. Hulon stressed

that the changes in plaintiff's spine and lumbar, thoracic, and cervical areas did not correlate with

the amount of pain plaintiff reported, but "[i]t doesn't mean she doesn't have it." (Tr. 78).

When asked whether plaintiff's pain would interfere with her concentration, Dr. Hulon

responded:

> If, it's hard for me to see what kind of, you know, I hear what she's saying. When
> you have severe pain it's hard to focus, you know, but, but again, I have to go
> back with what the imaging data shows and what the clinicians say that, you
> know, that it's there, they can't do anything, but it's, it's a little off. There's more,
> there's more subjective pain than should be there, you know, and that's kind of
> where they're going. You know, and if she says she has more I can't argue. I
> can't argue about the pain she has.

(Tr. 81). Thus, because the ME acknowledged that plaintiff's impairments could cause her

reported symptoms and that examining physicians could have different opinions as to the severity

of her pain and degree of resulting limitations, Dr. Hulon's testimony does not constitute

substantial evidence in support of the ALJ's decision to reject the treating physician's opinion.

*See Atterberry*, 871 F.2d at 570.

Finally, the ALJ relied on plaintiff's credibility or lack thereof when determining the

weight to assign Dr. Pagani's opinion, as well as the opinions of each of the examining and non-

examining physicians of record. The ALJ found Dr. Pagani's opinion to be "inconsistent" with

"credible portions of the descriptions of the claimant's activities of daily living." (Tr. 16).

However, the ALJ gave no indication as to what "portions" of plaintiff's activities of daily living

14

he deemed credible. In fact, the ALJ made only brief mention of plaintiff's daily activities in his decision, noting that she testified she has difficulty performing household chores and that some days she will not leave her bedroom due to depression. (Tr. 15). Further, the ALJ did not explain how the limitations Dr. Pagani found on sitting, standing, lying down and walking for more than 15-minute periods and the need to take several breaks during the day were inconsistent with plaintiff's activities of daily living. He did not cite any testimony or evidence in the record that he believed to be inconsistent with the functional limitations found by Dr. Pagani.

Furthermore, although the ALJ rejected Dr. Grefer's 2004 opinion on the sole ground that the later medical evidence showed plaintiff was able to perform work at the light exertional level, the ALJ did not cite any evidence to show that plaintiff's condition improved subsequent to Dr. Grefer's 2004 opinion. In fact, there is medical evidence indicating that plaintiff continued to suffer chronic pain and that her condition worsened following issuance of Dr. Grefer's 2004 opinion that plaintiff was limited to sedentary work. Plaintiff's treating pain management physicians reported in December 2005 that she continued to experience "intractable axial low back pain possibly of facet joint origin" for which "diagnostic facet joint denervations" were required. (Tr. 572). Plaintiff underwent radiofrequency treatment in April 2006 but reported obtaining little relief. (Tr. 567, 568). Plaintiff continued to undergo decompression therapy from June through August 2006 and received a lumbar epidural injection in September 2006, but she continued to report little relief, and records indicated that more invasive interventional therapy was needed. (Tr. 560-66). An MRI performed in February 2007 disclosed "[l]eft lumbar scoliosis with multilevel disc displacements most pronounced at L4-5, where a shallow broad-based protrusion eccentric to the left results in mild central canal stenosis, biforaminal

15

narrowing, and left lateral recess stenosis," and it was reported the findings had increased in severity as compared to MRI findings from 2003. (Tr. 468). Plaintiff began pain management treatment with Dr. Michael Fletcher, M.D., and Dr. Pagani beginning in August 2008. (Tr. 790-92). On January 26, 2009, a spinal cord stimulator was implanted for relief of "chronic intractable pain," in the form of back pain and bilateral burning foot pain. (Tr. 819). In light of this evidence, the ALJ's decision to give Dr. Grefer's opinion less than controlling weight on the sole ground that later medical evidence showed a different functional capacity than that assessed by Dr. Grefer is not supported by substantial evidence.

In addition, the ALJ failed to analyze the factors that must be considered in determining the weight to afford a treating physician's opinion that is not entitled to controlling weight. The ALJ did not consider the length and nature of the treating relationship; Dr. Grefer's orthopedic specialty; how well-supported by the evidence Dr. Grefer's opinion was; and how consistent the opinion is with the record as a whole. If the ALJ determined that any of these factors were not pertinent to his decision because there was evidence showing that plaintiff's condition had changed over time, then the ALJ was required to explain this. *See* 20 C.F.R. § 404.1527(c). Thus, the ALJ's decision to afford Dr. Grefer's opinion less than controlling weight cannot stand.

The ALJ's decision reflects a failure to analyze the factors that must be considered in determining whether a treating physician's opinion is entitled to controlling weight. In addition, the ALJ failed to analyze the factors that must be considered in determining what weight to afford a treating physician's opinion if the ALJ declines to give the opinion controlling weight. The ALJ did not explain his decision to give "some weight" to Dr. Grefer's opinion that plaintiff can perform sedentary work. (Tr. 16). The ALJ listed reasons for discounting Dr. Pagani's

16

opinion, but he did not adequately explain those reasons and he relied on testimony by the ME
that was seemingly consistent with Dr. Pagani's opinion to reject the limitations the treating
neurologist imposed. Thus, the ALJ failed to satisfy the requirement that he provide "good
reasons" for not giving controlling weight to a treating physician's opinion, *see Cole*, 661 F.3d at
937, and the ALJ's decisions to afford "lesser weight" to Dr. Pagani's assessment and "some
weight" to Dr. Grefer's opinion therefore lack substantial support in the record.

### b. Mental impairments

Plaintiff contends the ALJ erred by failing to give "good reasons" to reject the mental
limitations imposed by plaintiff's treating psychiatrist, Dr. Geraldine Wu, M.D., and instead
affording the most weight to the opinions of the examining and state agency reviewing medical
sources as to the degree of plaintiff's mental limitations. (Doc. 8 at 12-13). In determining
plaintiff's mental RFC, the ALJ gave "great weight" to the psychological assessments of
consultative examining psychologist Dr. Christopher Ward, Ph.D., (Tr. 741-47) and state agency
reviewing psychologist Dr. Melanie Bergsten, Ph.D., who completed a Psychiatric Review
Technique and mental RFC assessment (Tr. 757-74). (Tr. 17). Dr. Ward evaluated plaintiff in
April 2008. He reported that plaintiff presented as depressed and anxious. Dr. Ward diagnosed a
dysthymic disorder and generalized anxiety disorder, and he assigned plaintiff a Global
Assessment of Functioning (GAF) score of 51.[5] Dr. Ward opined that plaintiff was slightly

---

[5] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The
GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and
occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of
severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with
clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having
"serious" symptoms. *Id.* Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.* The
next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally
functioning pretty well." *Id.* Individuals with scores of 71-80 have symptoms which, if they are present, "are

impaired in her ability to relate to others, including fellow workers and supervisors; slightly impaired in her ability to understand, remember, and follow simple instructions; moderately impaired in her ability to maintain attention, concentration, persistence, and pace; and moderately impaired in her ability to manage the stress and pressure associated with day-to-day work activity. (Tr. 745). Dr. Bergsten opined that plaintiff had mild limitations in her activities of daily living and in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 767). Dr. Bergsten found that plaintiff's allegations were credible. (Tr. 773). She concluded that plaintiff retained "the ability to complete tasks that do not involve more than daily planning." (*Id.*).

The ALJ gave "lesser weight" to the opinion of Dr. Wu, plaintiff's treating psychiatrist. (Tr. 17). Plaintiff began treating with Dr. Wu in January 2008. (Tr. 850-55). On the date of the initial visit, Dr. Wu diagnosed a major depressive disorder and assigned plaintiff a GAF score of 50. (Tr. 850-55). Dr. Wu also completed a questionnaire noting plaintiff suffered from a depressed mood, chronic pain, panic attacks, fearfulness, high anxiety, low energy, and decreased concentration, memory and activities of daily living. (Tr. 738-39). In March 2008, plaintiff reported that the new medication she was taking was "doing great for me. It has changed me completely." (Tr. 848). Dr. Wu assigned plaintiff a current GAF score of 75. (*Id.*). In January 2010, Dr. Wu completed a mental RFC questionnaire listing plaintiff's diagnoses as a major depressive disorder, recurrent and depression due to chronic pain. (Tr. 902-06). She assigned plaintiff a GAF score of 65. (Tr. 902). Dr. Wu opined that plaintiff was "seriously limited, but

---

transient and expectable reactions to psychosocial stresses; [they have] no more than slight impairment in social, occupational, or school functioning." *See* DSM-IV at 32.

not precluded" in several areas of mental functioning, including her abilities to remember work like procedures, to maintain attention for two-hour segments, to maintain regular attendance and punctuality, to sustain an ordinary routine without special supervision, to work in coordination with her proximity to others without being unduly distracted, to make simple work-related decisions, and to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (Tr. 903-04). She had limited but satisfactory ability to interact appropriately with the general public and to maintain socially appropriate behavior. (Tr. 904). Dr. Wu also opined that plaintiff had marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and that she had experienced three or more episodes of decompensation lasting at least two weeks within a single twelve month period. (Tr. 905).

The ALJ gave "good reasons" for failing to give controlling weight to the opinion of Dr. Wu. (Tr. 17). The ALJ acknowledged that Dr. Wu is a treating source, but the ALJ discounted Dr. Wu's January 2008 assessment on the ground it was based on an "inferior longitudinal" record because plaintiff had visited Dr. Wu only once at that point. (Tr. 16, citing Tr. 738). The ALJ determined that Dr. Wu's January 2010 mental RFC assessment finding three or more episodes of decompensation and marked limitations (Tr. 902-06) was unsupported by the objective medical evidence, the activities of daily living, and the high GAF scores she assigned in her treatment notes covering the period January to November 2009. (Tr. 16, citing Tr. 840-855). Those reasons find substantial support in the record. Dr. Wu gave her initial assessment on the day of plaintiff's first visit (Tr. 738-39, 850-55), so this assessment was not entitled to the special deference afforded a treating provider's opinion. *See* 20 C.F.R. § 404.1527(c)(2)

19

("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)."). Nor was the ALJ bound to adopt the extreme limitations found by Dr. Wu in her January 2010 assessment (Tr. 902-06). Those limitations are not supported by Dr. Wu's own findings. Dr. Wu assigned plaintiff GAF scores that improved following her initial assessment and consistently ranged from 65 to 75 after March of 2008. (Tr. 848- 3/18/08 GAF 75; Tr. 847- 4/29/08 GAF 75; Tr. 846- 7/16/08 GAF 65; Tr. 845- 10/1/08 GAF 65; Tr. 844- 2/10/09 GAF 65; Tr. 843- 5/6/09 GAF 75; Tr. 842- 7/24/09 GAF 65; Tr. 841- 11/3/09 GAF 65). These scores indicate only mild to moderate symptoms and are inconsistent with the marked limitations in mental functioning Dr. Wu found in her January 2010 assessment. (Tr. 902-06). Dr. Wu's findings of marked limitations in mental functioning are also inconsistent with her findings in her mental assessment that plaintiff's mental abilities and aptitudes needed to perform unskilled work are seriously impaired but are not precluded. (Tr. 903-04). Furthermore, Dr. Wu cited no evidence in support of her conclusion that plaintiff had experienced multiple episodes of decompensation of an extended duration.[6] (Tr. 905).

Plaintiff alleges that the ALJ erred by discounting Dr. Wu's opinions because the limitations Dr. Wu imposed are supported by objective test results, an elevated depression score contained in the record, and Minnesota Multiphasic Personality Inventory (MMPI) test results.

---

[6] *Episodes of decompensation* are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." Listing of Impairments, § 12.00.C.4.

(Doc. 8 at 12-13, citing Tr. 509, 540, 544, 723)[7].  The evidence plaintiff cites does not constitute

substantial evidence showing the ALJ erred in discounting Dr. Wu's opinion.  The depression

test score refers to a "depression severity test" administered by Dr. Pagani in November 2007.

(Tr. 509).  It appears the test was a series of subjective questions and no explanation for the score

is provided, such that the test score holds no evidentiary value.  The MMPI test was administered

in 2004, long before plaintiff began treating with Dr. Wu, and the psychologist who administered

the test did not give an opinion as to any resulting functional limitations.  (Tr. 540, 544).  Thus,

those results likewise are of no evidentiary value.  Plaintiff further indicates that Dr. Wu's

findings are supported by Dr. Hulon's testimony that plaintiff would have "good days" and "bad

days."  (*Id.*, citing Tr. 40, 61, 79)[8].  However, Dr. Hulon's testimony in this regard pertains to

plaintiff's physical impairments and not any possible limitations attributable to her mental

impairments.  (*See* Tr. 40 - "She does have some bulging disks in there . . . it's like having a

good day/bad day;" Tr. 79 - plaintiff is "going to have good and bad days" as a result of her back

pain).  Thus, Dr. Hulon's testimony does not support Dr. Wu's opinions.  Plaintiff also alleges

her "daily activities" support the limitations Dr. Wu imposed because she performs these

activities "on good days, with help, and when able."  (Doc. 8 at 13).  Counsel offers no

evidentiary support or explanation for this argument.  As counsel has failed to develop this

argument, the Court declines to speculate on its import.

     In addition, plaintiff contends the ALJ failed to account for Dr. Wu's findings that she

would miss over four days of work a month and that she had decreased energy, was easily

---

[7] Tr. 723 is a duplicate of Tr. 509.

[8] Tr. 61 is an erroneous cite because it refers to plaintiff's testimony.

distracted, and had problems with attention (*Id.* at 10), which plaintiff argues are consistent with Dr. Ward's findings on his one-time examination that plaintiff was depressed and very tearful and she complained of fatigue and low energy. (*Id.*). Yet, plaintiff ignores the balance of Dr. Ward's opinion that despite these findings, plaintiff was only moderately limited in certain functional areas and was not precluded from all work activity. Dr. Ward accounted for plaintiff's psychological symptoms when finding that plaintiff had limitations in her work-related mental abilities (Tr. 745), and the ALJ in turn incorporated these functional limitations into plaintiff's RFC by limiting plaintiff to routine and repetitive work that does not require more than daily planning and does not have more than occasional contact with coworkers, supervisors, or the general public. (Tr. 14-15). While the functional limitations found by Dr. Ward were not as restrictive as those imposed by Dr. Wu, the ALJ was not required to accept Dr. Wu's opinion and impose greater limitations than those found by Dr. Ward. The ALJ gave "good reasons" for declining to give controlling weight to Dr. Wu's opinion. Substantial evidence supports the ALJ's decision to credit the opinions of the consultative examining psychologist, Dr. Ward, and the state agency reviewing psychologists over the opinion of plaintiff's treating psychiatrist.

### c. Conclusion

For these reasons, plaintiff's second and third assignments of error should be sustained only insofar as the ALJ discounted the opinions of plaintiff's treating physicians concerning the limitations imposed by her physical impairments. The ALJ's decisions as to the weight afforded the treating, examining and non-examining mental health sources should be upheld.

### 2. The ALJ's RFC finding is not supported by substantial evidence.

Plaintiff alleges as her first assignment of error that the ALJ's RFC finding is not

supported by substantial evidence.  Plaintiff presents a number of arguments in connection with

this assignment of error.  She asserts that: (1) the ALJ did not comply with Social Security

Ruling 96-8p, which requires the ALJ to provide a narrative discussion of the RFC assessment so

that it can be reviewed on appeal, particularly by failing to discuss the impact of plaintiff's crying

spells on her ability to work; (2) the ALJ selected only the portions of the record that supported a

non-disability finding and ignored those that did not, specifically Dr. Vasiloff's credibility

finding pertaining to plaintiff's physical limitations (Tr. 780) and Dr. Hulon's testimony that

plaintiff has good days and bad days and needs to change positions; (3) the ALJ erred by relying

on the opinion of the consultative examining physician, Dr. Fritzhand, who provided only a

snapshot of plaintiff's condition on the day of the examination and whose opinion that plaintiff

can perform "at least a mild amount of sitting, ambulating, standing, bending, pushing, pulling,

lifting, and carrying heavy objects" does not equate to six hours of those activities; (4) the ALJ

erred by failing to state the activities of daily living he relied on to find plaintiff is not credible;

(5) the ALJ erred by disregarding the limitations imposed by plaintiff's treating physician, Dr.

Pagani, which would not allow for long periods of standing and walking; and (6) the ALJ failed

to discuss evidence showing plaintiff suffers from depression, failed to acknowledge that the

state agency reviewing psychologist found plaintiff's complaints regarding her "nervous"

impairment to be credible, and failed to account for the work-related limitations imposed by

plaintiff's mental impairments, which would cause plaintiff to be absent from work an excessive

number of days.

  The ALJ determined that plaintiff has the RFC to perform light work as defined in 20

C.F.R. § 404.1567(b), except that she can lift not more than 20 pounds occasionally and not more

than 10 pounds frequently; she can push/pull not more than 10 pounds using hand or foot controls; she can sit, stand, and walk about six hours each in an eight-hour workday; she is unable to climb ladders, ropes, or scaffolds; she can stoop, kneel, crouch, or crawl not more than occasionally; and due to her mental limitations, any job she could perform must be routine and repetitive and must not require more than daily planning, and she must not have more than occasional contact with coworkers, supervisors, or the general public. (Tr. 14-15).

For the reasons stated above, the nonexertional limitations included in the ALJ's RFC finding are substantially supported by the evidence of record. As explained in connection with the resolution of plaintiff's second and third assignments of error, the ALJ gave good reasons for declining to adopt the limitations imposed by plaintiff's treating psychiatrist, Dr. Wu, including her opinion that plaintiff would be absent from work at least four days a month. (Tr. 905). Moreover, the ALJ did not err by failing to specifically explain how plaintiff's crying spells affected her functioning. Plaintiff argues that the ALJ erred in this regard because he found she has a severe dysthymic disorder impairment, depression is part of that diagnosis, and crying spells are a symptom of the depression. (Doc. 8 at 8-9). However, the ALJ weighed the opinions of the mental health sources, each of whom accounted for plaintiff's depressive symptoms when determining the degree of limitation on her mental functioning (Tr. 741-746, 757-774), and the ALJ accounted for those mental limitations in the RFC. (Tr. 14-15). Plaintiff also argues that the ALJ was bound to credit plaintiff's reported symptoms because he gave "great weight" to the state agency reviewing psychologist, Dr. Melanie Bergsten, Ph.D., who found that plaintiff's allegations were credible, but the ALJ failed to explain how plaintiff could work with the symptoms she testified about. (Doc. 8 at 9). Plaintiff suggests that because the ALJ accepted Dr.

24

Bergsten's opinion regarding plaintiff's limitations, he was bound to find all of plaintiff's allegations, including those that Dr. Bergsten had no opportunity to review, to be credible and to find her disabled. (*Id.*). Clearly the ALJ was not bound to accept plaintiff's testimony based on Dr. Bergsten's earlier review of the record. Moreover, Dr. Bergsten opined that even accepting plaintiff's reported symptoms as credible and despite her impaired mental functioning, plaintiff maintained the ability to complete tasks that did not involve more than daily planning. (Tr. 773). Accordingly, plaintiff's arguments as to why the mental portion of the RFC is not supported by substantial evidence are not well-taken.

For the reasons stated in connection with plaintiff's second and third assignments of error, the physical portion of the RFC is not supported by substantial evidence. (Tr. 14-15). Specifically, Dr. Hulon's testimony does not support the ALJ's finding that plaintiff can sit, stand and walk for six hours in an eight-hour workday without restriction. As explained above, Dr. Hulon's testimony is consistent with the opinion of plaintiff's treating neurologist, Dr. Pagani, that plaintiff needs to alternate positions and take several breaks throughout the day. (Tr. 1149). In addition, the ALJ did not give "good reasons" for discounting the opinion of plaintiff's treating orthopedist, Dr. Grefer, that plaintiff is limited to sedentary work. (Tr. 461). Thus, plaintiff's first assignment of error should be sustained.

### 3. The ALJ's credibility determination is not supported by substantial evidence.

Plaintiff argues the ALJ erred in assessing her pain, credibility and subjective complaints by failing to comply with the requirements of 20 C.F.R. § 404.1529 and SSR 96-7p.[9] (Doc. 8 at

---

[9] Social Security Ruling 96-7p and 20 C.F.R. § 404.1529(c)(3) describe a two-part process for assessing the credibility of an individual's statements about symptoms, including pain. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the

13-17). Plaintiff asserts the ALJ improperly used boilerplate language to evaluate her credibility; discounted her credibility based on the fact she had not undergone more extensive back surgery when treating specialists specifically noted this would not alleviate her pain; erroneously indicated there had been no positive straight leg raising test results and failed to note other positive findings made on plaintiff's back examinations; relied on an allegedly unsupported finding that plaintiff had engaged in part-time work; erroneously determined that plaintiff had made conflicting representations about the side-effects of her medications; relied on evidence of noncompliance with treatment that he failed to develop; and relied on alcohol and drug abuse of a minor nature to discount her credibility. (Tr. 15-17). Plaintiff points to additional evidence that allegedly supports her credibility. Plaintiff argues "she does her daily activities at her own pace, on a good day, when able, and with help"; her husband's testimony that she cries daily and has about "one-half good days a month" must be given significant weight because it is consistent with the other evidence (Tr. 94-95); and she has a good work history which the ALJ considered but did not evaluate. (Doc. 8 at 17).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the ALJ's opportunity to observe the individual's demeanor, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Secretary of Health and*

---

location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p.

*Human Services*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers,* 486 F.3d at 247. Rather, such determination must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.*

Here, the ALJ did not simply recite boilerplate language in discounting plaintiff's credibility; rather, the ALJ relied on many specific factors in assessing the credibility of plaintiff's allegations of pain and limitations, many of which are supported by the record. (Tr. 15-16). First, the ALJ accurately noted that plaintiff was not consistent in reporting side effects from medication. (Tr. 16, citing Tr. 253, 266, 996). Plaintiff asserts the ALJ committed factual error in this regard because she was not taking the same medications in January 2008 when she applied for benefits and reported no side effects, and in August 2008, at which time she reported fatigue from Methadone. (Doc. 8 at 15, citing Tr. 253, 288). In fact, plaintiff was taking a number of the same medications in both January and August 2008 but reported side effects from those medications only in August 2008. (Tr. 253, 288). Moreover, plaintiff does not address the

27

ALJ's reliance on her treating physician's October 2008 report noting that she was experiencing no side effects from her medications in October 2008. (Tr. 996).

Second, the ALJ properly discounted plaintiff's credibility based on inconsistent representations she made as to whether she has worked since her alleged onset date. The ALJ cited an August 2009 physician's report concerning follow-up for a fracture which stated that plaintiff was "now working part time from home and overall doing fairly well." (Tr. 835). Plaintiff's counsel appears to confirm in the Statement of Errors that plaintiff worked after the onset date as a typist, which she failed to disclose during the administrative proceedings. (Doc. 8 at 15 - conceding there is no evidence of plaintiff's work activity in the administrative record, but alleging that working at home afforded plaintiff a flexibility that the unskilled jobs listed by the VE would not because she "could type when able at home, on her good days, and she could take breaks when she needed at home."). The ALJ reasonably discounted plaintiff's credibility based on her misrepresentations concerning her work activity.

Third, the ALJ reasonably discounted plaintiff's credibility based on inconsistent representations she made about her history of alcohol and illicit drug abuse. (Tr. 16). Plaintiff denied a history of alcohol or illicit drug abuse to Dr. Ward. (Tr. 742). However, she had a positive drug screen for marijuana in May 2007 (Tr. 552) and "considerable alcohol" consumption was noted in March 2006 (Tr. 1097).

On the other hand, the ALJ improperly relied on a number of factors in support of his credibility determination that cannot reasonably be said to negatively impact plaintiff's credibility. First, the ALJ discounted plaintiff's credibility on the grounds the only surgical procedures she had undergone for her back were an endoscopic laser diskectomy and the

28

implantation of a spinal cord stimulator. (Tr. 15, citing Tr. 574, 822). However, in making this finding, the ALJ failed to note that plaintiff's physicians had determined that surgery would not alleviate plaintiff's "intractable" back pain. (*See* Tr. 488- Dr. Thomas Berger, M.D., of the Mayfield Clinic informed plaintiff that it was unlikely "surgery on her spine is likely to relieve her of her pain"; Tr. 511-12 - plaintiff's treating neurologist, Dr. Pagani, opined that "the findings in her MRI are not amendable to be corrected," and "unfortunately she has chronic intractable pain due to irreversible lesions on her spine that cannot be corrected by surgery or anything else." (Tr. 511-12). In light of these medical findings, the fact that plaintiff did not undergo additional back surgery is not an accurate reflection on the credibility of her complaints of pain and accompanying limitations. The ALJ also improperly discounted plaintiff's credibility because she has never been hospitalized for her depressive disorder without explaining how this negatively impacts her credibility. In addition, the ALJ relied on evidence of noncompliance with treatment that appears to have no bearing on plaintiff's credibility. The ALJ noted that plaintiff was discharged from physical therapy at NovaCare Rehabilitation in March 2004 because she did not return after an appointment (Tr. 381), but this fact is of no significance because the reason for her failure to return after her last scheduled appointment is not set forth in the record. The ALJ also stated that it was reported that plaintiff had stopped taking Lovaza, a cholesterol lowering drug[10], in June 2009. (Tr. 863). The ALJ did not explain why he believed plaintiff's discontinuance of a prescription medication for the treatment of high cholesterol reflected adversely on the credibility of her complaints of back pain and accompanying limitations.

---

[10] *See* http://www.rxlist.com/lovaza-drug.htm (last accessed February 9, 2013).

The ALJ cited a number of valid reasons for questioning plaintiff's credibility, and counsel has not presented evidence in support of his arguments that the ALJ was obligated to consider additional factors, including plaintiff's husband's testimony and the pace at which she performs her activities of daily living, in assessing her credibility. (Doc. 8 at 17). However, the ALJ also relied on a number of factors that cannot reasonably be said to undermine plaintiff's credibility, most importantly her failure to undergo additional back surgeries and psychiatric hospitalization. The ALJ's erroneous reliance on these factors takes on increased significance given the testimony of the ME, Dr. Hulon, that plaintiff's back impairments could cause the pain and symptoms she alleges. (Tr. 40-41). Thus, while a credibility assessment, though not flawless, must be upheld so long as substantial evidence supports the ALJ's determination and any errors do not negate the validity of the ultimate conclusion, *see Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012), the Court finds that the ALJ's ultimate conclusion as to plaintiff's credibility in this case is not supported by substantial evidence. Plaintiff's fourth assignment of error should be sustained and on remand, plaintiff's credibility should be reassessed.

**4. The ALJ erred by relying on the VE's testimony.**

Plaintiff alleges that the ALJ erred by relying upon the vocational testimony because the hypothetical questions presented to the VE failed to account for the numerous functional limitations supported by the record. (Doc. 8 at 18). Specifically, plaintiff alleges that the hypothetical the ALJ posed to the VE failed to account for limitations on her ability to sit and stand for prolonged periods of time; failed to account for her need to be absent from work more than two days a month as found by Dr. Wu and supported by Dr. Hulon's testimony that she

would have good and bad days; and failed to account for limitations based on her crying spells. Plaintiff also argues that if she were limited to only sedentary work as found by Dr. Grefer, she would be disabled under Grid Rule 201.14. (*Id.*).

A VE's testimony does not constitute substantial evidence if the hypothetical does not adequately describe the claimant's physical and mental limitations. *Lancaster v. Commissioner of Social Sec.*, 228 F. App'x 563, 573 (6th Cir. 2007). *See also Renn v. Commissioner of Social Sec.*, No. 1:09-cv-319, 2010 WL 3365944, at *6 (S.D. Ohio August 24, 2010) (Beckwith, S.J.). To the extent the ALJ declined to include the unsupported limitations in Dr. Wu's assessment in his hypothetical questions to the VE, the Court finds no error. Nor was the ALJ bound to include a limitation that plaintiff would be absent from work more than two days per month based on Dr. Hulon's testimony that she would have good and bad days. Dr. Hulon imposed no functional limitations in connection with his general testimony that plaintiff would have good days and bad days due to her back pain. However, to the extent the ALJ's RFC assessment improperly disregarded limitations imposed by plaintiff's treating physician, Dr. Pagani, the hypothetical presented to the VE may not properly reflect plaintiff's physical impairments and/or limitations. Accordingly, the ALJ erred by relying on this vocational testimony to carry his burden at Step 5 of the sequential evaluation process. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's impairments). Plaintiff's fifth assignment of error should be sustained.

## IV. This matter should be remanded.

If the Commissioner's decision is not supported by substantial evidence, the Court must

31

decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.* The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Id.*

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. This matter should be remanded to the Commissioner for proper evaluation of the weight to afford the opinions of plaintiff's treating physicians, Drs. Grefer and Pagani; for reconsideration of plaintiff's RFC; for reassessment of plaintiff's credibility; and to obtain additional medical testimony and vocational evidence as

32

warranted.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: 2/25/13

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHRISTA BLATZ,                                     Case No. 1:11-cv-895
      Plaintiff,                                  Spiegel, J.
                                                                       Litkovitz, M.J.

     vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).